# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 43 | **DATE** | 12/9/2004 |
| **CASE TITLE** | Andrew Foster vs. JoAnne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Plaintiff's Motion for Summary Judgment [#19] is hereby granted; Defendant's Motion for Summary Judgment [#25] is denied and the case is remanded to the Commissioner for further proceedings consistent with this Opinion. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 10 2004 date docketed | 28 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/9/2004 date mailed notice | |
| FT/*aley* | courtroom deputy's initials | U.S. DISTRICT COURT 2004 DEC -9 AM 10:05 Date/time received in central Clerk's Office | FT mailing deputy initials | |

IN THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW FOSTER, | ) | |
| | ) | Case No. 04 C 43 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Arlander Keys |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
DEC 1 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Andrew Foster moves this Court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, reversing the final decision of the Commissioner of Social Security, which denied his application for Supplemental Security Income (SSI). *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (West 2002). In the alternative, Plaintiff seeks an order remanding the case to the Commissioner for further inquiry and evidence. The Commissioner has filed a Cross-Motion for Summary Judgment in her favor. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment is granted, and the Commissioner's Motion for Summary Judgment is denied.

## PROCEDURAL HISTORY

On April 2, 2001, Plaintiff filed an application for Supplemental Security Income ("SSI"), claiming that frostbite on both of his feet rendered him disabled.[1] (R. at 86.) Plaintiff's claim

---

[1]The decision of the Administrative Law Judge states that Plaintiff filed his application for Supplemental Security Income payments on March 8, 2001. (R. at 10.) Plaintiff's Application for Supplemental Security Income, however, was filed on April 2, 2001. (R. at 86.) This discrepancy has no bearing on any issue before this Court and will not effect the outcome of this case.

was denied on June 4, 2001. (R. at 57.) On June 20, 2001, Plaintiff filed a Request for Reconsideration, which was denied on October 18, 2001. (R. at 61, 63.)

On November 26, 2001, Plaintiff requested and received a hearing before Administrative Law Judge ("ALJ") Michael R. McGuire. (R. at 67-70.) Following the hearing, the ALJ issued an unfavorable decision, finding Plaintiff not disabled at any time through the date of the decision, May 8, 2002. (R. at 10-16.) Plaintiff then filed a request to review the ALJ's decision with the Social Security Administration Appeals Council ("Appeals Council"). The Appeals Council denied the request on November 5, 2002; the ALJ's decision stands as the final decision of the Commissioner. (R. at 5-6.)

## STATEMENT OF FACTS

### A. Evidence Presented at Plaintiff's Hearing.

#### 1. Plaintiff's Testimony

At the hearing, Plaintiff testified that he was born on December 20, 1956 and had a high school education. (R. at 22, 29.) He stated that he lived at the Hope House Transitional Shelter for men, and that he had been residing there for sixteen months. (R. at 22.) For more than ten years before living at the shelter, Plaintiff had been either homeless or in prison. (R. at 23.) He had a history of drug abuse, but had not used drugs for approximately two years before his hearing. (R. at 40) Plaintiff had no significant work experience, and he had not worked in the fifteen years preceding the hearing. (R. at 30.)

Plaintiff's claim for supplemental Social Security Income is based upon a frostbite injury to both of his feet. (R. At 21.) At the time of his hearing, he was visiting Cook County Hospital approximately once per month for treatment. (R. at 30.) In addition to the hospital visits, a

2

Chicago Health Outreach nurse would examine his feet during her bi-monthly visits to the shelter. *Id.* As of the date of his hearing, Plaintiff was also seeking treatment for his foot injuries at the Cook County Hospital Pain Clinic ("Pain Clinic"). (R. at 44.)

To manage his pain, Plaintiff was taking prescription Neurontin, 400 mgs per day. (R. at 45.) He testified that his doctors had recently increased this dosage to 1000 mgs, three times a day. (R. at 31, *see* R. at 45.) Side effects from this medicine included laziness, drowsiness, and sleeplessness. *Id.* His doctors also prescribed amitriptyline, 50 mgs, to him. (R. at 31-32, 46-47.) Though he felt that this medication was a more effective pain reliever, he was instructed to take it only at night, because it included a sleep aid. (R. at 32.) Plaintiff was originally taking 75 mgs of amitriptyline. He felt, however, that the medication made him "snap at people;" consequently, his doctor dropped the dosage to 50 mgs. (R. at 46.)

In addition to medication, Plaintiff's doctors tried other methods to treat his pain. At the time of the hearing, doctors at Cook County hospital had performed a series of Lumbar Sympathetic Blocks on him. (R. at 34, 42-43.) One of these procedures gave him complete relief for approximately five days (R. at 34.) Plaintiff also testified that the doctors at the Pain Clinic were considering a procedure in which they would burn the damaged nerves in his feet to relieve his pain. He was scheduled to meet with his doctor to discuss this procedure after the date of the hearing. (R. at 41-42.)

In addition to his frostbite injuries, Plaintiff also had stomach pain. (R. at 33.) At the time of the hearing, Plaintiff found that he could effectively manage this pain by taking prescription Ranitidine, and by restricting his diet. (R. at 33-34.)

Aside from his physical ailments, a psychiatrist who met with Plaintiff diagnosed him

3

with a dysthymic disorder. Nonetheless, Plaintiff did not feel that he had any mental disability. (R. at 45.)

Plaintiff testified that his medical problems negatively affect his daily life. Plaintiff explained that he spends approximately ten percent of his day standing, and the rest of his time sitting, with his feet elevated on a pillow. (R. at 26, 29.)[2] Plaintiff wears special orthopedic shoes, because his feet swell two to three times per week. (R. at 40-41.)

He testified that his injuries have limited his mobility. Plaintiff was in a wheelchair from December of 2000 to January of 2001, and then, switched to a cane. (R. at 39.) While none of his doctors either prescribed the cane or gave him any instructions about the cane, his doctors seemingly saw the cane and did not object to Plaintiff using it. (R. at 40.) Plaintiff testified that he sometimes has trouble walking, standing, and climbing stairs, because his medication made him drowsy. (R. at 26-27, 47.) After breakfast, his limited mobility allows him to clean only the immediate area that he occupied. (R. at 25.) Plaintiff had someone else do his laundry, because the nearest laundromat is more than one hundred feet from the shelter, and he has difficulty walking that distance. (R. at 32.)

Plaintiff occupied his days at the Hope House by attending spiritual or drug-abuse meetings, watching television, reading, or writing. (R. at 24, 26, 33.) One summer, he sold flavored ice at a sidewalk stand outside of the shelter. (R. at 27-28.) He sat in a chair while working. (R. at 37.) For running the stand, he was given bus fare and lunch. (R. at 35.) He

---

[2]Plaintiff testified that either his pain doctor or a Chicago Health Outreach nurse instructed him to elevate his feet. However, there is no reference to such an instruction in the record. (R. at 26, 47-48.)

4

testified that he never earned more than five hundred dollars per month during the time that he worked at the stand. (R. at 38.)

### 2. Vocational Expert's Testimony

Mr. Pagella, a vocational expert ("VE"), testified at Plaintiff's hearing. The ALJ described to Mr. Pagella a person with no work history, and of the same age and with the same education as the Plaintiff. (R. at 49.) The hypothetical assumed that the person could lift or carry ten pounds; stand or walk for two hours in an eight hour day; sit for six hours; and push or pull up to ten pounds. *Id.* The ALJ asked the VE further to assume that the person would need the option to sit or stand; would need to avoid any exposure to cold; would need to avoid situations where he would be required to walk more than one hundred feet at a time; and would need to avoid stairs, ropes, ladders, scaffolds, and heights. *Id.* The hypothetical person would also need to wear soft orthopedic shoes and would consequently need to avoid situations where he would likely injure his feet. *Id.*

Mr. Pagella testified that the hypothetical individual could perform three different jobs. First, he could perform work as a cashier, of which there are approximately 17,300 positions available in the Chicago Metropolitan Region. (R. at 49-50.) Second, he could perform work as an information clerk, of which there are 2,600 positions available in the Chicago Metropolitan Region. (R. at 50.) Finally he could perform work as a loss prevention clerk, of which there are 1,800 positions available in the Chicago Metropolitan Region. *Id.*

Plaintiff's attorney asked the VE what jobs would be available to an individual who would have to be "off task," because of drowsiness or distraction from pain. The VE responded that, if an individual was off task for one hour a day, there would be no substantial gainful

5

activity that this person could perform. (R. at 51.) Plaintiff's attorney then asked if any of the three jobs that the VE described would allow for a person to elevate his feet for up to one-third of the day, every day. *Id.* The VE's opinion was that neither information clerk nor cashier would be jobs available to the hypothetical person who needed to elevate his feet. (R. at 52.) The VE further testified that fifty percent of the loss prevention jobs would not be available to this person. (R. at 52-53.)

### 3. Medical Evidence

Plaintiff submitted medical records to the ALJ detailing his treatment since his injury. The Court will discuss these records in full.

### Cook County Hospital Emergency Services

Plaintiff visited the Emergency Room at Cook County Hospital (the "ER") three times. On November 29, 2000, Plaintiff visited the ER, complaining that his feet had been swollen and numb for four days. (R. at 151.) He also complained of abdominal pain. *Id.* The doctor prescribed Rantidine for his abdominal pain, and instructed Plaintiff to return if his symptoms became worse or if he had problems with a fever or vomiting. (R. at 152.)

Plaintiff returned to the ER on December 3, 2000, complaining that his feet were still swollen. (R. at 147.) He explained to the ER doctor that he had been sleeping in a cold, abandoned building and wearing damp socks when his foot problems started. *Id.* The doctor noted some abnormalities in both sensation and appearance, and edema in up to two-thirds of Plaintiff's leg. *Id.* The doctor diagnosed Plaintiff with frostbite and instructed him to take Motrin for pain. (R. at 148.) The doctor instructed Plaintiff to stay away from cold exposure, and to follow up at the Cook County Hospital Fantus Health Center Foot Clinic. *Id.* Plaintiff

was also to return to the ER if his feet became numb or discolored, or if he developed a fever. *Id.*

On December 4, 2000, Plaintiff returned to the ER complaining of swelling, paresthesia, and reduced range of motion. (R. at 149.) The attending doctor noted that Plaintiff's feet were mildly swollen, exquisitely tender, and that there was increased pigmentation in his toes. The doctor also noted that the pain was causing a decreased range of motion and that there was a small hemorrhage on Plaintiff's left foot. *Id.* The doctor diagnosed Plaintiff with frostbite and instructed him to continue taking Motrin; to keep his feet warm, dry, and uninjured; and to keep his appointment at the foot clinic. (R. at 150.)

### Cook County Hospital Fantus Health Center (Foot Clinic)

Pursuant to his ER instructions, Plaintiff followed up with a doctor at the Fantus Health Center on December 12, 2000. Plaintiff complained that the pain in his feet was gradually becoming worse and that he had difficulty walking. The doctor noted edema of both feet and pain in palpation of both feet, but also noted that Plaintiff's frostbite was healing. (R. at 146.)

### Lake Shore Medical Clinic, Ltd., Ghanim Kassir, M.D.

The SSA referred the Plaintiff to Ghanim Kassir, M.D. for an examination which was performed on May 10, 2001. (R. at 153.) Plaintiff complained to Dr. Kassir that he had constant throbbing pain in his feet when standing or walking for long periods of time, or when sleeping. (R. at 153.) He reported that this pain was the result of a frostbite injury. *Id.* Plaintiff also complained of symptoms of gastroesophageal reflux disease. *Id.* Dr. Kassir's examination showed that neither pretibial nor pedal edema was present in either leg, that the toes on both feet appeared to be intact, and that there was no evidence of ischemic injury. (R. at 154.) Dr. Kassir observed that Plaintiff used a cane on ambulation for weight bearing and confidence. However,

he also noted that Plaintiff was capable of walking without his cane for a distance of about one hundred feet. *Id.* Additionally, Dr. Kassir observed that there was no evidence of a limp or staggering on ambulation. *Id.* Dr. Kassir concluded that Plaintiff suffered from gastroesophageal reflux disease and that the pain on the dorsum of both feet persisted following his recovery from frostbite. (R. at 155.)

### Chicago Health Outreach, Inc.

Plaintiff testified that nurses from Chicago Health Outreach ("CHO") frequently examined him. (R. at 30.). The record documents several such examinations from January of 2001 to February of 2002. (*See* R. at 167-186, 210-215.) During these examinations, Plaintiff would typically complain of pain and swelling in his feet and of chronic abdominal pain. (*See, e.g.* R. at 167, 170-173, 210-212.) The nurses observed that Plaintiff had peripheral neuropathy in both feet. (*See, e.g.* R. at 167, 171, 173, 210, 212, 215.) They also noted that Plaintiff had chronic abdominal pain and gastroesophageal reflux disease. (*See, e.g.* R. at 167, 214.)

A nurse from CHO referred Plaintiff to the Cook County Hospital Pain Clinic in May of 2001. (R. at 169.) The Pain Clinic prescribed much of Plaintiff's medication. (*See, e.g.* R. at 228, 236, 241.)

In Plaintiff's treatment notes, the CHO staff members generally noted the medication that Plaintiff was taking, including prescription Rantidine, 150 mg, for his chronic abdominal pain. (R. at 167, 178, 182, 185, 211, 214.) They also noted that the medication that Plaintiff took for his foot pain evolved over time. Plaintiff often took amitriptyline to relieve the pain in his feet.

8

(*See* R. at 167-173, 183, 185, 210-212.)[3] In September of 2001, the CHO staff observed that Plaintiff was taking both amitriptalene and Neurontin to deal with his pain. (R. at 211.) By October of 2001, the CHO staff recorded that Plaintiff was taking 75 mg of amitriptalene per day, and that his doctors had increased his Neurontin prescription to 400 mg three times per day. (R. at 212.) The professionals from CHO noted that, in February of 2002, Plaintiff's doctors had increased his Neurontin prescription to 1000 mg, three times per day. (R. at 215.)

**Cook County Hospital Pain Clinic**

The Pain Clinic evaluated Plaintiff on August 14, 2001. (R. at 238.) The doctors concluded that Plaintiff had neuropathic pain from frostbite to both feet and prescribed medication for this pain. (R. at 241.) On October 2, 2001, the doctors at the Pain Clinic performed a Spinal Differential Block procedure. (R. at 233.) In the following months, the doctors performed a series of Lumbar Sympathetic Blocks on the Plaintiff. (R. at 218, 222, 225.) Plaintiff testified that, while these procedures gave him a few days of complete relief, the pain would inevitably return. (R. at 34, *see* R. at 228.)

**Allen D. Nelson, M.D., S.C.**

Allen D. Nelson, M.D., S.C. conducted a psychiatric evaluation of Plaintiff on September 17, 2001. He noted that Plaintiff came to the appointment by himself and on public transportation. (R. at 187.) He further noted that Plaintiff walked with a marked limp and with the aid of a cane. *Id.*

---

[3]In the Memorandum in Support of Plaintiff's Motion for Summary Judgment, Plaintiff states that his doctors prescribed him various medications, "including amitriptyline and Elavil." (*See* Pl.'s Mot. Summ. J. at 4.) In fact, Elavil is one of several brand names for the generic medication amitriptyline.

9

Plaintiff told Dr. Nelson about the chronic pain in his feet and of his history of abdominal pain. *Id.* Plaintiff described his long history of alcohol and drug abuse, but also stated that he had been drug-free for eight months and that he attends daily AA and NA meetings. *Id.* He described chronic moderate depression and anxiety, but noted that his symptoms were moderately improving. *Id.* Plaintiff also told Dr. Nelson that he had been incarcerated for one year between 1999 and 2000 for selling drugs. (R. at 188.)

Dr. Nelson observed mild impairments in memory and mild deficits in abstractive functioning. (R. at 189.) He noted that Plaintiff's judgment was fairly intact and that he has good insight into his problems. (R. at 190.) Dr Nelson diagnosed Plaintiff with a dysthymic disorder and borderline intelligence, and he noted that Plaintiff's overall psychiatric prognosis was fair. *Id.*

### D.G. Hudspath, Psy.D.

On October 9, 2001, D.G. Hudspath, Psy.D. reviewed Plaintiff's records at the request of the Social Security Administration ("SSA"). (*See* R. at 192-209.) Dr.Hudspath noted that Palintiff had affective disorders, substance addiction disorders, and a dysthymic disorder. (R. at 192, 195.) Dr. Hudspath concluded that Plaintiff would have a mild restriction of activities of daily living, a mild difficulty in maintaining social functioning, and a mild difficulty in maintaining concentration, persistence, or pace. He further concluded that, while Plaintiff would be moderately limited in the ability to understand, remember, and carry out detailed instructions, he nonetheless would be able to perform two and three step tasks and would be able to communicate with fellow employees. (R. at 206, 208.)

### Social Security Administration Doctors

On May 24, 2001, T. Arjmand, M.D. determined that Plaintiff was status post frostbite injury and that he suffered from gastroesophageal reflux disease. (R. at 56.) Furthermore, Dr. Arjmand opined that Plaintiff would be capable of performing sedentary work. (R. at 165.) On October 11, 2001, Victoria J. Dow, M.D. determined that Plaintiff suffered from an affective/mood disorder, and that he had borderline intellectual functioning. (R. at 55.)

### B. The ALJ's Decision

On May 8, 2002, the ALJ issued his decision, finding that Plaintiff was not disabled. (R. at 16.) He reviewed all of the evidence of record in making this decision. (R. at 10.) The ALJ evaluated Plaintiff's personal and work history, as well as the VE's testimony. (R. at 10-15.) He stated that he also considered all medical opinions in the record regarding the severity of Plaintiff's impairment. (R. at 11, 15.)

The ALJ found that Plaintiff was a younger individual, between the ages of forty-five and forty-nine, and that he a high school education. (R. at 15.) He also found that Plaintiff had neither performed any past relevant work, nor engaged in any substantial gainful activity since the alleged onset of his disability. *Id.*

The ALJ determined that Plaintiff's impairment was severe, based upon the requirements in the Regulations, but that his impairment nonetheless did not meet, or medically equal, one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. *Id.*

The ALJ concluded that Plaintiff's statements about having foot pain during periods of prolonged standing or walking were credible. (R. at 13, *see* 15.) Nonetheless, the ALJ also

concluded that Plaintiff's statements that this pain would not permit him to perform even sedentary work were neither credible nor medically based. *Id.*

In determining residual functional capacity (RFC), the ALJ concluded that Plaintiff could lift, carry, push, or pull up to ten pounds, sit six out of eight hours, and stand and/or walk two hours out of eight, but he would need to change positions periodically, to avoid exposure to cold, and to avoid climbing ladders, ropes, scaffolds or working at unprotected heights. (R. at 15.)

The ALJ found that Plaintiff's RFC enabled him to perform a broad range of sedentary work, and he relied on the VE's testimony to determine if a significant number of jobs existed in the national economy that the Plaintiff could perform. (R. at 15-16.) The ALJ concluded that Plaintiff could qualify for approximately 17,300 cashier jobs, 2,600 information clerk jobs, and 1,800 loss prevention clerk jobs. (R. at 16.)

As a result of the above-listed findings, the ALJ determined that Plaintiff was not disabled, as defined in the Social Security Act, at any time through May 8, 2002. (R. at 16.)

## STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible).

The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992); *Herron*, 19 F.3d at 333 (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") This does not mean that the ALJ is entitled to unlimited judicial deference, however. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level. *See Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order for meaningful appellate review). The ALJ must build "an accurate and logical bridge" from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Finally, although Plaintiff bears the burden of demonstrating his disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that, if the ALJ found the evidence before him insufficient, he should have obtained more evidence).

## SOCIAL SECURITY REGULATIONS

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a

13

severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920; *see also Young*, 957 F.2d at 389. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4, but the burden shifts to the Commissioner at step 5. *Id.*

The ALJ's analysis at step 5 typically involves an evaluation of the claimant's RFC to perform a particular category of work (i.e. sedentary, light, medium, heavy, or very heavy work), in combination with an application of the Medical-Vocational Guidelines ("the Grid") to determine whether an individual of the claimant's age, education, and work experience could engage in substantial gainful activity. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2. The Grid is a chart that classifies a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2dd 635, 640 (7th Cir. 1987). If the use of the Grid is appropriate, the Commissioner or ALJ may rely upon it for determining disability, and, in such a case, the Grid alone constitutes substantial evidence sufficient to uphold the decision of the Commissioner. *Id.*

However, where a plaintiff suffers from significant non-exertional impairments, the ALJ may not rely upon the Grid. *See* SSR 83-14. "When a plaintiff's non-exertional impairments significantly diminish his ability to work . . . the Commissioner must introduce the testimony of a

14

vocational expert (or other similar evidence) that jobs exist in the economy which plaintiff can obtain and perform." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he is not disabled. Plaintiff argues that the ALJ's decision should be reversed or remanded, because he failed to consider all of the testimony and evidence relevant to Plaintiff's alleged disability, and because he failed to adequately analyze whether, and to what extent, any of Plaintiff's symptoms would affect his ability to hold down a job. For the reasons set forth below, the Court remands this matter for further proceedings.

At the hearing, Plaintiff testified generally about dealing with his pain. He testified that he was taking two different prescription medications to manage his pain, and that, over the course of his continuing treatment, his doctors had adjusted these prescriptions to better alleviate his pain. (*See* R. at 31-32, 45-47.) Furthermore, Plaintiff testified both that his doctors had treated his pain by performing various medical procedures on him, and that he had an appointment scheduled subsequent to the hearing to discuss additional such procedures with his doctor. (*See* R. at 34, 41-43.) This testimony (except for the testimony about the post-hearing procedures) is supported by the evidence in the record. (*See, e.g.,* R. at 211, 212, 215, 218, 222, 225.)

Plaintiff additionally testified that, most days, he spent a majority of the day seated, with his feet elevated as a way to manage his pain. (*See* R. at 26, 47-48.) Moreover, he testified that the pain medication he took caused him side effects of laziness, drowsiness, and sleeplessness. (*See* R. at 31, 45.)

15

Despite the aforementioned testimony and evidence, the ALJ did not specifically analyze Plaintiff's allegations of pain, his claim that he needed to elevate his feet, or his allegations about the side effects of his medication. Instead, the ALJ summarily concluded that "[t]he claimant's statements that he has foot pain with prolonged standing or walking is found to be credible, but claims that he has pain that would not permit even sedentary work are not found to have a medical basis or be credible." (R. at 13.) He added, "I find the DDS assessment, that the claimant is limited to sedentary work, to be generally consistent with the medical evidence." *Id.* The ALJ made no further statement as to Plaintiff's credibility.

"The ALJ's credibility determinations generally will not be overturned unless they were 'patently wrong.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Nonetheless, Social Security Ruling 96-7p prohibits ALJs from making conclusory credibility determinations, and instead requires them to articulate the reasons behind their credibility findings.[4] *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); Social Security Ruling 96-7p (1996). If the ALJ's decision is "so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940, (7th Cir. 2002).

---

[4]Social Security Ruling 96-7p states in pertinent part: "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight." (S.S.A. July 2, 1996).

Here, the ALJ made a conclusory determination about Plaintiff's credibility. The ALJ failed to articulate the basis for the credibility determination, and neglected to address the testimony or evidence pertaining either to Plaintiff's need to elevate his feet, or to the side effects that his medication caused. Seemingly, the ALJ felt no need to address this evidence since he generally found incredible Plaintiff's claim that his foot pain would not permit even sedentary work. Nonetheless, "[w]hen the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1983) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981)). The Court does not require the ALJ to perform a written evaluation of all of the testimony and evidence, but "a minimal level of articulation of the ALJ's assessment of the evidence is required." *Zblewski*, 732 F.2d at 79.

Because the ALJ's credibility conclusion is not supported by any analysis, the Court is unable to determine what, in fact, was the ALJ's reasoning, or if his reasoning was sound. Given Plaintiff's unrebutted testimony from the hearing, the ALJ should have specifically articulated the basis for his credibility determination, and at least considered the side effects from Plaintiff's medication, his need to elevate his feet, and how either of these might have impacted his ability to hold down a regular job. If the ALJ considered but rejected Plaintiff's testimony concerning the side effects of his pain medication and his need to elevate his feet, then he was required to explain such a finding. However, his conclusory decision "offers no clue as to whether [he] *examined* the full range of medical evidence as it relates to [Plaintiff's] claim." *Zurawski* 245 F.3d at 888 (emphasis in original).

The ALJ did not address the testimony that related either to the side effects of Plaintiff's

17

medication or to Plaintiff's need to elevate his feet. In addition, he summarily concluded that Plaintiff's claims were not credible by generally finding that the DDS assessment that Plaintiff could perform sedentary work was generally consistent with the medical evidence. (See R. at 13.) Given the totality of the record, this explanation is not an articulation that affords meaningful review.

This Court recognizes that valid reasons may well exist to doubt Plaintiff's testimony concerning his pain, his need to elevate his feet, or the side effects of his medication. Nonetheless, the ALJ and not this Court, is charged with the job of pointing to *specific* medical evidence that undermines Plaintiff's testimony. The ALJ did not do this. This was inappropriate, and the Court must, therefore, remand the case for further proceedings.

## CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's failure to articulate the basis for his credibility determination prevents meaningful review. In particular, to the extent that the ALJ found Plaintiff's testimony to be unbelievable, he failed to specifically explain why this was so. Accordingly, the Court must grant Plaintiff's Motion for Summary Judgment, and deny the Commissioner's Motion for Summary Judgment. This matter is remanded for further proceedings consistent with this opinion.

Dated: December 9, 2004   E N T E R:


_____
ARLANDER KEYS
United States Magistrate Judge